**BRISCOE RANCHES, INC., et al.,**
Appellants,

v.

**EAGLE PASS INDEPENDENT SCHOOL
DISTRICT et al., Appellees.**

No. 14757.

Court of Civil Appeals of Texas.

San Antonio.

Jan. 29, 1969.

Rehearing Denied April 2, 1969.

See also Tex.Civ.App., 439 S.W.2d 117.

Clemens, Knight, Weiss & Spencer, Theo F. Weiss, Edward R. Finck, San Antonio, Petry & Fitzpatrick, Carrizo Springs, for appellants.

Hume & Hume, David Hume, Eagle Pass, Lavern D. Harris, Kerrville, for appellees.

BARROW, Chief Justice.

This is an appeal from an order overruling an application for a temporary injunction. Appellants, who are owners of rural property in appellee School District, filed suit on September 9, 1968, seeking injunctive relief from an allegedly arbitrary and discriminatory plan of taxation by said District, its Tax Assessor-Collector, the

Board of Equalization and the Trustees of said District.

A temporary restraining order was granted without notice, restraining and enjoining said officials, pending the hearing for temporary injunction, from making up, examining or approving general tax rolls for the District, using values set by the Board of Equalization, from assessing, or attempting to assess any taxes on appellants' properties based upon the valuations set by said Board, and from collecting or attempting to collect taxes on appellants' properties based on these valuations. The hearing on the application for temporary injunction began September 18, 1968, and testimony was heard during a five-day period. At the conclusion of appellants' evidence, which consisted primarily of testimony by a member of the Board of Equalization, the Secretary of the Board of Trustees, who was ex-officio secretary of the Board of Equalization, the Tax Assessor-Collector, and several appellants, the trial court sustained appellees' oral motion for judgment which was based on several theories, denied appellants' application for a temporary injunction, and dissolved the temporary restraining order. Thereafter, appellees proceeded with their statutory duties and at the time of oral argument in this Court on January 8, 1969, all of the tax statements had been mailed out and approximately fifty per cent of the total taxes owed the District were paid.

██ Appellees filed a motion to dismiss this appeal as moot, in that the acts sought to be enjoined have been performed. It is true that after the restraining order was set aside by the trial court on September 24, 1968, the Board of Equalization approved the tax rolls, and tax bills were prepared on the basis of the tax rate set by the Trustees from the Board of Equalization's total assessed valuation, and sent to all taxpayers. A substantial part of the taxes have now been paid by owners of all types of property in the District. It is, therefore, too late to set aside the scheme or plan of taxation, in that it has now been fully implemented and put in operation. City of Arlington v. Cannon, 153 Tex. 566, 271 S.W.2d 414 (1954); Seguin Independent School Dist. v. Blumberg, 402 S.W.2d 552 (Tex.Civ.App.—San Antonio 1966, writ ref'd n. r. e.). After this appeal was perfected, several of the original appellants voluntarily paid their taxes in full, and the motion to dismiss is not contested as to these parties.[1] Other appellants have paid only the taxes assessed against their mineral interests and still challenge the assessment against their lands. These appellants, as well as those who have not paid any of their 1968 taxes, are entitled to show that the taxes on their land have been illegally assessed and to secure relief in the event they prevail at the trial on the merits. Whelan v. State, 155 Tex. 14, 282 S.W.2d 378 (1955); State v. Whittenburg, 153 Tex. 205, 265 S.W.2d 569 (1954); Skinner Corp. v. Calallen Ind. School Dist., 409 S.W.2d 929 (Tex.Civ.App.—Corpus Christi 1966, no writ). Appellees' motion to dismiss is therefore overruled as to these appellants.

Appellants urge that the trial court abused its discretion in denying the temporary injunction because the admissions of appellees and the undisputed evidence establish the Board of Equalization adopted an arbitrary and illegal scheme of assessment of rural property by classifying all rural land in the District into three general classifications and setting one predetermined value to all land in each classification regardless of the uniformity or quality of same. They also urge that the evidence conclusively establishes a calculated plan and design to wilfully omit at least $9,000,000 worth of taxable bank deposits from the tax rolls. It is also asserted that the Board of Equalization did not hear any sworn testimony to justify an increase in

1. J. W. Chamness, Mrs. Gus Krausse, Dewey B. Nix, Silver Lake Ranches, Inc., Moody Ranches, Inc., Ray T. Fisher, Edward Pendell, W. L. Moody IV, Hal and Herminia O. Bowles, Paul and Hilda W. Knight.

the values of the individual land from that established by the rendition of said land by the individual appellants and/or the Tax Assessor-Collector.

Certain well-established rules are applicable to our review of this case. The trial judge is endowed with broad discretion to grant or deny a temporary injunction. It is therefore well settled that the scope of appellate review from such an order is limited to the narrow question of whether the action of the trial judge in granting or denying the temporary injunction constitutes a clear abuse of discretion. Janus Films, Inc. v. City of Fort Worth, 163 Tex. 616, 358 S.W.2d 589 (1962); Texas Foundries v. International Moulders & Foundry Workers' Union, 151 Tex. 239, 248 S.W.2d 460 (1952).

Ordinarily, it is not a substitute for, nor does it serve the same purpose as the hearing on the merits. Southwest Weather Research, Inc. v. Jones, 160 Tex. 104, 327 S.W.2d 417 (1959); Labbe v. Carr, 369 S.W.2d 952 (Tex.Civ.App.—San Antonio 1963, writ ref'd n. r. e.).

The basic complaint of appellants relates to the action of the Board of Equalization in dividing rural land into three general classes and setting a base value to each classification. There is no complaint that appellants were discriminated against in the Board's valuation of their rural property, in fact, the complaint is the converse, all land within a classification was considered of equal value. Nor is there any contention or showing on this appeal that there was any discrimination against rural landowners as opposed to owners of other type property. There was no showing that rural property was assessed at any greater percentage of market value than city property, utilities or minerals. Appellants' complaint boils down to the contention that although all land in the District is obviously not alike, the Board illegally adopted a scheme of valuation which did not allow for the individual differences.

The Constitution and laws of this State require taxing authorities to assess all property on the basis of its reasonable cash market value and require that all taxes be equal and uniform. Art. VIII, § 1, Constitution, Vernon's Ann.St.; Art. 7174, Vernon's Ann.Civ.St. It has been recognized that exact uniformity and equality of taxation is an unattainable ideal. Whelan v. State, supra. Nevertheless, the Board of Equalization is charged by law and by oath with the ultimate responsibility of working to such an ideal. Arts. 7211–7212, 7215, Vernon's Ann.Civ.St.

Appellee Board of Equalization, sometimes hereinafter referred to as Board, was duly appointed and qualified on June 5, 1968. Prior thereto most of appellants had rendered their property or the Tax Assessor-Collector had rendered same substantially in accordance with the 1967 valuations. Under same, all pasture land was divided into three classes and assessed accordingly: $13.00 per acre for the best land, $9.75 per acre for middle, and $6.50 per acre for poorest land. Nearly all the land was in the lower two classifications. Irrigated land was apparently divided into four classes, although it is not clear that all classifications were used and no real complaint is made on this appeal as to the Board's 1968 valuations of same. After qualifying, the Board members made considerable inquiry and checked into the 1967 valuations which were used as the basis for most of the 1968 renditions made by appellants and the Tax Assessor-Collector. The Chairman testified that he inspected land from one end of the District to the other and examined the 1967 valuations of same. The only city in the District is Eagle Pass, and the valuations of the business and residential property in Eagle Pass were examined and compared. The mineral and utility valuations were also checked. Based upon such investigation and after considerable discussion, the Board members made and adopted certain findings on June 22, 1968, which were to be used in their equalization work.

The Board members found that minerals and utilities had been assessed at 100% of market value, based upon a recent appraisal by a professional firm. Further, the business and residential property in Eagle Pass had been accurately appraised at 85% of market value. However, the appraisals on pasture land had never been completed and the values by classifications did not reflect a true market value. There was testimony before the Board that the 1967 valuations on pasture land reflected about 37% of cash market value. The Board found that there had been no consistent pattern for the various land classifications or values assigned to pasture land. From a check of recent sales it was determined the cash market value of pasture land should be based on a valuation of $40.00 an acre, of gravity irrigated land on a valuation of $240.00 per acre, and of pump irrigated land on a valuation of $160.00 per acre. To equalize the tax burden the Board determined to leave the Eagle Pass valuations on the same basis as the 1967 appraisals, to reduce the mineral and utility valuations by 15%, and apply a 15% reduction to the pasture and irrigated land valuations set by the Board. The District taxed at 65% of this reduced value, and this would be applied to determine the final assessed valuation of all property.

Notices to this effect were timely sent to all taxpayers, and on July 8, 1968, many rural landowners, including appellants, appeared before the Board, either personally or by agent, to protest this proposed scheme which would result in very substantial tax increases for the owners of rural property. Undoubtedly as a result of these protests, professional appraisers were subsequently hired to assist the Board of Equalization, and the Board directed one of these appraisers to inspect the land of any protesting landowner. As a result of these inspections and other evidence heard by the Board, reductions were made in the proposed valuations of the pasture land owned by several of appellants. For example, if it were shown that part of the land was salted, or was below par for any other reason, the value was reduced accordingly. If no appraisal was requested, the pasture land remained at the base value of $40.00, and accordingly was assessed at the value of $22.10 per acre—i. e., $40.00 x 85% x 65%. The Board also ordered the Tax Assessor-Collector to further reduce by 15% the appraised value of any land located in the tick zone as established by the Federal authorities. The 1968 tax rolls when completed show a total valuation of over fifty-five million dollars as compared to about forty-seven million in 1967. The increased valuation came from substantial new construction in Eagle Pass, as well as from substantial increase in the valuation of rural property. After a budget was duly adopted, the School Trustees reduced the tax rate from $1.55 per $100.00 in 1967 to $1.29 in 1968.

The Board heard much evidence in the many hearings it held in an effort to equalize the heavy tax burden of this District. Protests were heard from owners of both city and rural property. Although appellants made no attempt to show that the property in the City of Eagle Pass was not in truth assessed at 85% of cash market value, there was evidence of new construction which would support a finding that it was so assessed. Furthermore, there was no question raised as to the Board's finding that minerals and utilities were not in fact assessed at 100% of cash market value before equalized by the Board. Some of appellants owned extensive mineral holdings and have voluntarily paid taxes on said mineral valuations. There was no evidence, other than the 1968 renditions based on 1967 valuations, to show that the pasture land was not of a cash market value of at least $40.00 an acre. Appellants made no attempt at this preliminary hearing to establish the market value of their land either as individual tracts or in comparison with other property valuations in the District. One of the appellants suggested to the Board early in the proceedings, that brush land should be equally valued. Another

testified $40.00 per acre was "pretty close to taw" on the market value of his land. Most of the land owned by appellants was in large tracts and although the quality would likely vary in the tract, we cannot say that the record establishes, as a matter of law, that any taxpayer's pasture land did not average the assessed valuation of $40.00 per acre cash market value. We therefore cannot say that the scheme adopted by the Board to equalize the tax burden is arbitrary, capricious, or illegal as a matter of law.

Appellants established that the two banks in the District had over $9,000,000 on deposit or in accounts receivable on January 1, 1968, belonging to individuals, partnerships, and corporations, and at the time the tax rolls were prepared none were on the tax rolls. The Assessor-Collector testified, however, that he had been directed by the Board to continue to try to obtain the necessary information from the two banks and list same on a supplementary roll. An official from each bank testified that although such information had been requested by the District, neither bank would furnish it since such information was confidential under the law. See Arts. 342–709, Vernon's Ann. Civ.St. In any event, there was no evidence of any scheme or plan to exclude such property from taxation so as to discriminate against appellants, but rather there is evidence of a deliberate attempt by the Board to assess all property in the District. Superior Oil Co. v. Sinton Ind. School Dist., 431 S.W.2d 383 (Tex.Civ.App.—Corpus Christi 1968, no writ); Wilson v. City of Port Lavaca, 407 S.W.2d 325 (Tex.Civ.App. —Corpus Christi 1966, writ ref'd n. r. e.); Kelly v. A. & M. Consolidated Ind. School Dist., 398 S.W.2d 438 (Tex.Civ.App.—Waco 1966, writ ref'd n. r. e.).

Other alleged discriminatory acts were asserted in the trial court but have not been brought forward on this appeal. We have carefully examined the voluminous statement of facts and numerous exhibits attached thereto in the light of the above rules. From such examination, we cannot say that the trial court abused its discretion in denying the temporary injunction.

Appellants filed a motion for an injunction pendente lite at the time of submission of this case. Same was granted on January 15, 1969, to protect our jurisdiction, and we accordingly restrained appellees from collecting or attempting to collect appellants' taxes based upon the valuations set by the Board, pending further orders of this Court. Since we have found no error in the judgment of the court, it is ordered that said injunction pendente lite shall expire when our appellate jurisdiction expires.

The appeal is dismissed as to the following parties who have voluntarily paid their 1968 taxes: J. W. Chamness, Mrs. Gus Krausse, Dewey B. Nix, Silver Lake Ranches, Inc., Moody Ranches, Inc., Ray T. Fisher, Edward Pendell, W. L. Moody IV, Hal and Herminia O. Bowles, Paul and Hilda W. Knight. As to all other appellants, the judgment is affirmed.